IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of | No. 84930-1-I |
| MARTY L. KIME, | UNPUBLISHED OPINION |
| Petitioner. | |

BOWMAN, A.C.J. — Marty Kime seeks relief from his judgment and sentence through this personal restraint petition (PRP). He argues (1) his trial counsel was ineffective by not requesting limiting instructions for certain gang-related evidence, (2) his appellate counsel was ineffective by not raising that claim on appeal, and (3) the trial court erred by failing to give a limiting instruction about the gang-related evidence at the State's request. We disagree and deny his PRP.

FACTS

On the afternoon of April 16, 2015, Lisa Lynch was driving home from work in a Chevrolet (Chevy) Impala with her partner, Martrice Grant, in the passenger seat and their one-year-old daughter, Malijha Grant, strapped into her car seat in the backseat. They drove to a Kent shopping complex and stopped at CVS, Safeway, and a tobacco shop, then headed home. As they neared their apartment in Kent, Lynch heard gunshots. Martrice[1] grabbed Lynch's head and

---

[1] We refer to Martrice Grant and Malijha Grant by their first names for purposes of clarity and mean no disrespect by doing so.

told her to "duck down." Then he grabbed the steering wheel and ran the car onto a curb. When Lynch tried to raise her head, she saw a "dark car, four doors[,] with tinted windows" and a unique "oval shape" next to them. The front passenger window was down, and Lynch saw two men inside and a black handgun pointed out the window. Lynch heard a second round of gunshots and then the shooter's car quickly drove south.

Lynch checked on Malijha and saw that she had been shot in the head and was bleeding from her temple, above her right ear. Lynch and Martrice "panicked" and Lynch started "screaming for help." Martrice took Malijha's car seat out of the car and a bystander began CPR[2] until police arrived. An ambulance took Malijha to Harborview Medical Center. While at the hospital, detectives learned that Martrice had ties to Deuce 8, a gang from Seattle's Central District that had conflict with another local gang, Low Profile. So, the detectives thought that the shooting may have been gang related.

Two days after the shooting, on April 18, 2015, Malijha died. Dr. Richard Harruff of the King County Medical Examiner's Office performed Malijha's autopsy. He determined that a bullet went through Malijha's brain and killed her. He recovered the bullet from the left side of Malijha's scalp.

The officers who had investigated the scene after the shooting collected eight .40 caliber Smith & Wesson shell casings. They entered the casings into the National Integrated Ballistics Information Network (NIBIN) to compare them to casings from other shootings. Detectives got two NIBIN "hits" on the casings.

---

[2] Cardiopulmonary resuscitation.

The first database hit was a preliminary match to casings found at the scene of a shooting on March 23, 2015, in south Seattle. Detectives looked into that shooting but discovered nothing connecting it to Malijha's murder. The second NIBIN hit matched casings found at a shooting in the Central District on April 15, 2015, the day before Malijha was shot. Police connected the April 15 shooting to two teenagers, Vyshawn Warr and Abdifatah Mohamed. Both were affiliated with Low Profile. Detectives did not find evidence linking Warr or Mohamed to Malijha's death but they both became persons of interest.[3]

Detectives also learned that on April 17, 2015, the day after Malijha's murder, Low Profile member Jean Paul Mitchell-Jones was shot in Kent. Mitchell-Jones also became a person of interest. By April 20, 2015, there were "three persons of interest who were Low Profile associates." Police determined they needed to focus their investigation of the April 16 shooting on people affiliated with Low Profile.

Detectives also tried to identify the shooter's car. Surveillance images showed it was likely a 2009 to 2014 Chevy Cruze. On May 4, 2015, the police released images of the car to the media. Ciara Guiden recognized the car as hers. She told her mother, who called the police and identified the Chevy Cruze. Detectives seized the Cruze and interviewed Guiden several times. They learned that Guiden was dating Kime and often let him borrow her car, including on April 16, the day of Malijha's murder. Guiden said that when Kime returned the car that evening, he was unusually quiet and had cleaned the car, which he

---

[3] Detectives later concluded that Warr had an alibi on the day of Malijha's shooting.

had not done before. Guiden said that after Kime returned her car, she dropped him off at 9015 Canyon Drive in Kent.

Kime then became a person of interest in Malijha's murder. Detectives learned that Kime was a prominent member of Low Profile. And in January 2015, Kime was shot in downtown Seattle during an altercation with Deuce 8 members. Two months later, prominent Low Profile leader John Williams was shot in downtown Seattle and died on March 22, 2015. Low Profile members believed Deuce 8 may have been responsible for the shooting. Kime was close with Williams and distraught when he died.

On May 15, 2015, the police executed a warrant to search 9015 Canyon Drive. Several relatives of Williams lived there, including others associated with Low Profile. Detectives found a box of .40 caliber ammunition in a bedroom and a single .40 caliber round in the kitchen. They also found 19 cell phones belonging to people at the house.

On one cell phone, police discovered a photo of Kime in a car, pointing a loaded Smith & Wesson handgun into the camera. Kime posted the photo on Snapchat on March 30, 2015, about one week after Williams' death and two weeks before Malijha was killed. A state crime lab firearm and toolmark examiner concluded that the firearm in the photo most closely resembled a Smith & Wesson Sigma series handgun. The expert also concluded that the .40 caliber casings at the scene of Malijha's shooting were fired from the same type of gun. And the gun used in the March 23, 2015 shooting in south Seattle and the April

4

15, 2015 shooting in the Central District was also likely a Smith & Wesson Sigma series .40 caliber handgun.

Police never found the gun used to kill Malijha. But they found phone and Internet records showing that on the morning of the shooting, April 16, 2015, Kime texted his brother, Isaiah Woods, asking whether Woods took his gun. Woods said that Mitchell-Jones gave the gun to Gwendolyn Mayo, who lived at 9015 Canyon Drive. Later that morning, Kime asked for and received Mayo's phone number.

Commercial surveillance videos also showed that on April 16, 2015, Kime was near the murder scene. Around 4:15 p.m., Lynch entered the Safeway, and Guiden's Chevy Cruze drove through the parking lot in front of the Safeway entrance. After Lynch and her family left the Safeway parking lot, a gas station camera captured their car passing by, and then the Chevy Cruze passed by. Less than a minute later, Malijha was shot. Kime's phone records confirmed that he was driving near the family at the time of the shooting.

On December 10, 2015, Kime was serving time for a different offense at the Federal Detention Center SeaTac (FDC). Detective Richard Gilcrist visited Kime at the FDC and told him that the State was charging him with Malijha's murder. The same day, Kime contacted David Harrison, an inmate in his unit at the FDC who was being held "on gun charges." Kime told Harrison that detectives visited him about a shooting and asked Harrison his opinion about whether the State could charge him with a crime if they did not find a gun. A couple weeks later, Harrison read a newspaper article about the State charging

5

Kime with the murder of a child. Harrison asked Kime "if it was the truth" and Kime said that "it was an accident." Harrison then contacted his attorney with the information about Kime, hoping to reduce his sentence.

In May 2018, detectives obtained a search warrant for a phone associated with Woods. Police found videos on the phone from April 16, 2015, showing Kime and Woods in Guiden's car about an hour before Malijha's murder. The videos showed them driving near the CVS where Lynch, Martrice, and Malijha stopped that afternoon. In one video of Kime driving, he sees someone on the street and asks, "Is that Malcom?" Kime reaches to the floor beneath the driver's seat and Woods says, "No." Kime then says, "Oh, I thought we had him." Another video showed Kime and Woods rapping about "trying to catch a body."

Also in May 2018, Eric Little agreed to talk to the police. At the time of Malijha's shooting, Little was 16 years old and living at 9015 Canyon Drive with his mother. The night before the shooting, Kime was at Little's house. When police questioned Little in July 2015, he said he knew nothing about Malijha's murder except that he heard rumors that Low Profile was responsible. Two years later in June 2017, the State charged Little in an unrelated case with two counts of first degree assault and a firearm enhancement. Prosecutors offered Little a plea deal if he agreed to testify against Kime, and he accepted the offer.[4]

The State ultimately charged Kime with second degree felony murder and two counts of first degree assault with firearm enhancements. It brought the

---

[4] Little testified about being with Kime the night before Malijha was killed and the evening of the shooting after she was killed.

case under an accomplice liability theory, arguing that on April 16, 2015, Kime and an accomplice were in Guiden's Chevy Cruze, that they followed Martrice and his family, and that one of them fired the shots that killed Malijha. Several people testified against Kime, including Harrison and Little. Kime's defense focused on challenging those witnesses' credibility and shifting culpability onto other people of interest, like Mitchell-Jones and Mohamed.

Both Kime and the State brought in evidence about gangs. The State moved to admit certain gang-related evidence under ER 404(b), including evidence about Low Profile, Deuce 8, other gang-related shootings, how Kime joined Low Profile, Kime's own statements about his association with Low Profile, and Kime's animus toward Deuce 8. The State asked to admit the evidence through Facebook posts, videos of Kime rapping, pictures of Kime, and testimony. It argued that Kime's "gang identity and reason for being" were "probative of identity, motive, and premeditation." And it noted that a limiting instruction could ensure that the jury did not consider the evidence for an improper purpose. Kime responded, moving to exclude some gang-related evidence, like Kime's Facebook posts, testimony about the general conduct of Low Profile members, and videos of Kime rapping certain lyrics.

The trial court considered whether each piece of evidence was admissible for a limited purpose. It admitted, among other pieces of evidence, testimony by Low Profile members about Kime's gang activities and access to weapons, photos of Kime with gang affiliations and weapons, a clip of Kime rapping about a "Glock Smith," videos of Kime and Woods rapping in the car about "trying to

7

catch a body," and Facebook posts by Kime related to Low Profile and other gangs. The trial court told the parties several times that they could request a limiting instruction if they thought it was appropriate.

The jury convicted Kime as charged. The trial court sentenced Kime to 582 months' imprisonment. Kime appealed, arguing, among other things, that the trial court erred by admitting certain emotional and graphic evidence, denying two motions for mistrial, and improperly admitting ballistics evidence. *State v. Kime*, No. 79439-6-I, slip op. at 1-2 (Wash. Ct. App. Aug. 30, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/794396.pdf, *review denied*, 198 Wn.2d 1039, 501 P.3d 146 (2022). We found no error and affirmed. *Id.* at 33.

Kime then timely filed this PRP.[5]

ANALYSIS

Kime argues (1) his trial counsel was ineffective by not requesting limiting instructions about certain gang-related evidence, (2) his appellate counsel was ineffective by not raising that ineffective assistance of trial counsel issue on appeal, and (3) the trial court erred by failing to give a limiting instruction about the gang-related evidence at the State's request.[6] We address each argument in turn.

---

[5] On December 2, 2025, Kime moved this court to accept a supplemental designation of exhibits and trial court filings. We grant Kime's motion.

[6] Alternatively, Kime requests that we remand for a reference hearing under RAP 16.11(b). The "purpose of a reference hearing is to resolve genuine factual disputes." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Because there is no factual dispute here, we deny the request.

Relief by collateral challenge is " 'extraordinary.' " *In re Pers. Restraint of Fero*, 190 Wn.2d 1, 14, 409 P.3d 214 (2018) (quoting *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)).  Collateral relief is limited because "it undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders."  *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992).  Still, a petitioner may seek relief through a PRP when he is under unlawful restraint.  RAP 16.4(a).  Restraint is "unlawful" when the criminal conviction was obtained or the sentence was imposed in violation of the United States Constitution or Washington's laws or constitution.  RAP 16.4(c)(2).

When a petitioner alleges constitutional error in a PRP, they have the burden of showing by a preponderance of the evidence that the error caused "actual and substantial prejudice."  *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 814, 810, 792 P.2d 506 (1990); *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004).  "To show actual and substantial prejudice, a petitioner must show that the outcome likely would have differed had the alleged error not occurred."  *In re Pers. Restraint of Skone*, 30 Wn. App. 2d 1, 44, 543 P.3d 842 (2024).  We look at the totality of the circumstances, including the weight of the evidence, which requires that we review the whole record.  *Id.* While the "barrier to relief is greater than on direct appeal, we will still reverse if we have a 'grave doubt as to the harmlessness of an error.' "  *In re Pers. Restraint of Sims*, 118 Wn. App. 471, 477, 73 P.3d 398 (2003)[7] (quoting *In re*

---

[7] Internal quotation marks omitted.

*Pers. Restraint of Smith*, 117 Wn. App. 846, 860, 73 P.3d 386 (2003), *abrogated on other grounds by In re Pers. Restraint of Domingo*, 155 Wn.2d 356, 119 P.3d 816 (2005)).

When a petitioner alleges a nonconstitutional error, he must show that the error "constitutes a fundamental defect inherently resulting in a complete miscarriage of justice." *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 535-36, 167 P.3d 1106 (2007). This is a stricter preliminary showing than actual and substantial prejudice. *See Cook*, 114 Wn.2d at 811.

1. <u>Ineffective Assistance of Counsel</u>

Kime argues his trial counsel was ineffective by failing to request limiting instructions for gang-related evidence. We disagree.

An ineffective assistance of counsel claim presents mixed questions of fact and law that we review de novo. *State v. K.A.B.*, 14 Wn. App. 2d. 677, 707, 475 P.3d 216 (2020). A defendant has a constitutional right to effective assistance of counsel under article I, section 22 of the Washington State Constitution and the Sixth Amendment to the United States Constitution. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001). To show ineffective assistance of counsel, a defendant must show that (1) their counsel's representation was deficient and that (2) the deficient representation prejudiced the defendant. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

Counsel's representation was deficient if it "fell below an objective standard of reasonableness based on consideration of all the circumstances."

*McFarland*, 127 Wn.2d at 334-35. We presume counsel's representation was effective and require the defendant to show "the absence of legitimate strategic or tactical reasons for the challenged conduct." *State v. Fleeks*, 25 Wn. App. 2d 341, 352, 523 P.3d 220 (2023). Then, a defendant must demonstrate prejudice by showing a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *McFarland*, 127 Wn.2d at 335. A personal restraint petitioner who makes an ineffective assistance of counsel claim meets the burden of showing actual and substantial prejudice. *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 688, 363 P.3d 577 (2015).

Kime contends that his trial lawyers were ineffective because they failed to request certain limiting instructions, allowing the jury unfettered use of "highly prejudicial" information. Kime identifies specific pieces of gang-related evidence that he contends required limiting instructions. He points to a photograph of him in a car with a phone cord like the one in Guiden's Chevy Cruze. In it, he is holding gold chains and displaying his fingers in a gang sign. He also identifies other Snapchat and FaceTime pictures of him "flashing" gang signs. He contends the photos were admitted only to show that he had a pattern of using social media "to communicate with other individuals involved in the case." And he asserts that because there was testimony that flashing a Low Profile gang sign signifies a "gangbanger representing your hood," the photos show that he was "claiming his status as a 'gangbanger.'" Finally, Kime contends that the jury saw several booking photos of Low Profile members, "presumably limited to showing identity." And he argues that without a limiting instruction, the booking

photos instead showed that Low Profile members "have a propensity to commit criminal acts."[8]

But Kime's lawyers knew that they could ask for limiting instructions. Indeed, the trial court informed the parties several times that they could request them. And the record shows that Kime's counsel requested a limiting instruction when they thought it was appropriate.

For example, Kime's counsel asked for a limiting instruction advising the jury about the limited purpose of statements that Mohamed made about Kime. This suggests that his attorneys' decision not to request limiting instructions for the evidence that Kime identifies in this PRP was strategic. Kime's lawyers may have determined that a limiting instruction would reinforce to the jury that Kime possessed evidence linking him to the Chevy Cruze or that he had a pattern of using social media to communicate with others involved in the case. And they may have been less concerned about the evidence being used to show Kime's gang affiliation because both parties already introduced abundant evidence showing that Kime was a Low Profile member. And other evidence showed that Low Profile members had been arrested for crimes. In fact, the jury knew that several witnesses were Low Profile members, that they had been involved in

---

[8] Kime also complains about the admission of photos with the word "Stunna" on them and Slade's testimony about the lineage of that name among Low Profile members. But Kime does not properly raise the issue or provide argument about the admissibility of the evidence, so his claim is outside the scope of this PRP, and we do not address it. *See* RAP 10.3(a)(5), (6) (brief must contain the facts and procedure relevant to the issue on review and argument in support of the issue with citations to legal authority); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (we do not consider an assignment of error that is not supported by argument or citations to authority).

criminal activity or had been charged with serious crimes, and that they were seeking favorable resolutions in exchange for their testimony. So, Kime fails to overcome the presumption that his attorneys were effective.

Kime also fails to show a reasonable probability that limiting instructions would have changed the outcome of his trial. While Kime argues that the "State's case was weak," the record shows otherwise. As discussed above, there was abundant evidence that Kime was a member of Low Profile apart from the evidence that Kime identifies. And there was significant evidence that, among other things, Kime had a gang-related motive to shoot at Martrice, had access to the type of gun that killed Malijha, drove the shooter's car, and was at the scene at the time of the shooting. The pieces of evidence that Kime complains required limiting instructions were a minor part of the bulk of the evidence presented to the jury.[9]

We conclude that Kime's claim of ineffective assistance of trial counsel fails.[10]

---

[9] Kime argues that he suffered prejudice because his counsel's failure to request limiting instructions "flooded" the volume of evidence about his gang affiliation. But Kime's gang affiliation, his relationships with gang members, and his gang activities were central themes at trial and largely undisputed. Kime fails to show a reasonable probability that limiting instructions restricting the jury from considering the identified evidence for those purposes would have changed the outcome of the trial.

[10] Because Kime fails to show ineffective assistance of trial counsel, he also fails to show ineffective assistance of appellate counsel for failing to raise that issue on appeal. *See In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 787, 100 P.3d 279 (2004) (To prevail on an ineffective assistance of appellate counsel claim, a petitioner must show that the legal issue appellate counsel failed to raise had merit.).

2. <u>Trial Court's Failure to Give a Limiting Instruction</u>

Kime argues that the trial court erred by failing to give a limiting instruction about certain gang-related evidence when the State requested one. We disagree.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it may be admissible for other purposes, like proof of motive, intent, plan, or identity. ER 404(b). Under ER 105, an attorney may ask the court to issue a limiting instruction to "restrict the evidence to its proper scope." "Under the plain language of ER 105, the trial court has a duty to issue a limiting instruction only *upon request* for such an instruction." *State v. Russell*, 171 Wn.2d 118, 123, 249 P.3d 604 (2011). And "when a party fails to request a limiting instruction, that party is precluded from arguing that the lack of a limiting instruction was harmful error." *State v. Mohamed*, 186 Wn.2d 235, 245, 375 P.3d 1068 (2016).

Contrary to Kime's argument, the State never asked the trial court to give a limiting instruction for the admitted gang-related evidence. In its motion asking the court to admit gang-related evidence under ER 404(b), the State argued that its "presentation of evidence and theory of the case . . . will ask the jury to use the evidence solely to determine motive, opportunity and identity." And it said that a "limiting instruction from the Court will insure the jurors do not consider the evidence for an improper purpose." The State concluded by stating that the evidence "is not unduly prejudicial and the Court can instruct the jury how to use

14

the evidence." This does not amount to an express request for a limiting instruction.

Then, at trial, when the State asked the court to admit evidence of Kime singing rap lyrics, the prosecutor said:

> To avoid undue prejudice, the Court carefully reviews the lyrics and admits only the relevant portion. And even limiting instructions are suggested to help the jury know, if necessary more than normal, that they are the final factual decision makers here.

Again, the State's comments do not amount to an affirmative request for a limiting instruction. Instead, the State informed the trial court that it could give a limiting instruction to alleviate any risk of undue prejudice if the court determined it was warranted. And even if the State had requested a limiting instruction, Kime did not. So, he is precluded from arguing that the lack of a limiting instruction was harmful error. *See Mohamed*, 186 Wn.2d at 245.

Because Kime fails to show that his trial or appellate counsel were ineffective or that the trial court erred by not giving a limiting instruction, we deny his PRP.

_____, ACJ

WE CONCUR:

_____ Feldman, J.

_____ Díaz, J.